UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**WIELAND HOLDINGS, INC.**                                         **PLAINTIFF**

**vs.**                                   **CIVIL ACTION NO.  3:22-CV-72-CRS**

**SYNERGY TAX CONSULTANTS, LLC**                          **DEFENDANT**

<u>**MEMORANDUM OPINION**</u>

This is an action brought by Wieland Holdings, Inc., a global manufacturer of copper and copper alloy sheets, strips, foil tube, and fabricated components.  It seeks a declaration from this Court that the provision for payment of a contingent fee in its contract with Defendant Synergy Tax Consultants, LLC is void as against the public policy of Kentucky.  The parties agree that should the Court so find, an alternative method of payment for which the contract provides, an hourly rate of compensation, would govern in determining the sum due Synergy for services rendered to Wieland.[1]

For its part, Synergy initially challenges the ability of this Court to decide the declaratory judgment claim at all.  It then contends that nothing in Kentucky law precludes Synergy's acceptance of a contingent fee under the facts of this case.  In addition to moving for dismissal of the action, Synergy has now counterclaimed against Wieland for breach of contract and alternatively quantum meruit, unjust enrichment, and promissory estoppel.

---

[1] The parties use the terms "contingent" and "contingency" interchangeably in their briefs and both terms appear in the caselaw.  The Court's investigation has yielded no discernable difference in the meaning of the terms, yet "contingency" appears used most often with respect to contracts for attorneys' services.  The Synergy/Wieland contract references a "contingent fee" and KRS 11A.233 addresses "compensation contingent" on an outcome.  We will therefore employ "contingent fee" in this opinion.

I.      *Procedural Posture*

Pending before the Court are the following motions:

1.    Motion of Synergy to dismiss (DN 12)

2.   Motion of Wieland for summary judgment (DN 16)

3.   Cross-motion of Synergy for summary judgment (DN 22/23).

For the reasons set forth below, the Court will deny Synergy's motion to dismiss and its motion

for summary judgment and grant summary judgment in favor of Wieland in this matter.

II.     *The Parties and their Contract*

Wieland is a copper manufacturing and fabricating company incorporated in Delaware

with a principal place of business in Louisville, Kentucky. Compl., DN 1, p. 2, ¶ 3, PageID #2;

Countercl., DN 13, p. 1, ¶ 2, PageID #48.

Synergy Tax Consultants, LLC is a tax consulting company that provides services in

connection with securing state and local tax incentives for businesses.  DN 1, ¶ 10. Synergy is a

limited liability company organized under Michigan law.  Its sole member, Keith H. Stein, is a

Michigan citizen.  DN 1, ¶ 4; DN 13, ¶ 1.

Stein is an accountant who specializes in corporate taxation with a focus on state and

local tax and is the managing principal of Synergy.  DN 1-1, p. 6, PageID #12.  Beginning

around April of 2020, Synergy began identifying and evaluating incentives potentially available

in various states including Kentucky, Illinois, California, Indiana, Ohio, and Wisconsin for

development projects in which Wieland was interested; particularly, for the establishment of a

corporate office and manufacturing facility.  Wieland decided to pursue projects in Kentucky,

including a headquarters for Wieland North America in Louisville and a manufacturing facility

in Shelby County, Kentucky.

To that end, Wieland entered into a contract with Synergy in June of 2020 (referred to

variously as the "Letter," the "engagement letter," and the "contract"). The Letter proposed that

Synergy would "**provide Wieland Holdings, Inc…with certain credit incentive services…as**

**described…**" and represented that **"[t]he services provided pursuant to this Letter shall be for the**

**identification, negotiation and management of all state & local incentives relating to Wieland**

**Holdings, Inc…relating to any expansion projects included in Phase I – Project Planning and**

**Control (as described below).**" DN 1-1.  The Letter indicated that "**[s]et forth below are the terms**

**and conditions for this engagement**."  *Id.*  In pertinent part, the Letter specified the following

aspects of Synergy's proposed work:

1. **Scope of Services.**  You authorize me to assist you in obtaining state & local incentives
   as follows:

    i) **Phase** I -  **Project Planning and Control**
       (1)  establish control of the site selection process presentation
       (2)  identify alternative locations that will provide economic advantages
       (3)  gather all relevant data to be presented to all jurisdictions
       (4)  develop defined work plan to maximize presentation
       (5)  define process and data needs to identify and proactively address any
            unforeseen obstacles
       (6)  maintain presentation of project status as uncertain and tentative
       (7)  maintain client anonymity

    ii) **Phase** II - **Implementation**
       (1)  meet with state and local incentive personnel
            (a)  discuss scope of proposed project(s)
            (b)  identify cost benefits of alternative locations
            (c)  address applicability of all potential incentives
       (2)  evaluate alternative implementation options
       (3)  incorporate business objectives into the final expansion proposal
       (4)  negotiate incentive package with all relevant state & local incentive administrators

    iii) **Phase** III - **Compliance**
       (1)  assist client in understanding the detailed requirements to obtaining and maximizing
            the authorized incentives through the first year of compliance.
       (2)  assist client with all reporting requirements identified in the incentive agreement(s)
            through the first year of compliance.
       (3)  assist client in monitoring client activities to ensure compliance with the
            incentive agreement(s) through the first year of compliance.

Later in the contract, compensation terms are specified:

> **2.      Compensation and Payment.** The contingent fee component for this engagement will be 10% of the value of the approved incentives. This contingent fee will be due when the incentive package is finalized and the incentive agreement (Agreement) is signed by Client and the applicable government agency. The terms of such payment are as following:
>
> - Fifty percent (50%) of the contingent fee on January 15th of the year immediately following the execution of the Agreement
> - Fifty percent (50%) of the fee on January 15th of the year immediately following the first payment
>
> In addition, we shall be paid a fixed fee as follows:
>
> | | |
> |---|---|
> | Phase I  Project Planning and Control | $25,000 (due and payable after completion of Phase I) |
> | Phase II  Implementation | $60,000 (due and payable after completion of Phase II) |
> | Phase III  Compliance | $40,000 (due and payable after completion of Phase III) |
>
> In the event that Synergy is unable to legally accept the contingent fee as described above the contingent fee will be replaced with an hourly rate fee structure to compensate Synergy for the total hours worked on the engagement. Synergy shall be paid, in addition to the fixed fee described above, the difference between the actual cost of the engagement on an hourly basis and the fixed fee. By way of example, if Phase I would have cost $35,000 on the hourly rate basis, Synergy will be entitled to an additional $10,000 (i.e. $35,000 (Phase I hourly rate cost) - $25,000 (Phase I fixed fee) = $10,000 difference payable to Synergy in lieu of the contingent fee. The hourly rate for purposes of this paragraph is $325 per hour.
>
> In the event that Synergy is unable to legally accept the contingent fee as described above, Synergy agrees to keep reasonable records o [sic] the time spent on the engagement to substantiate the alternative compensation structure contemplated herein.

*Id.*

The culmination of Synergy's work on Wieland's behalf was the award of incentive packages for the Kentucky projects valued, by Synergy's calculations, at $95,670,780.00.[2] In January of 2022, Synergy submitted three invoices to Wieland seeking payment of a contingent fee purportedly due. Wieland informed Synergy that the contingent fee provision of the contract is void, as it contravenes the public policy of Kentucky as reflected in KRS 11A.233(4). It stated its position in a letter from John D. Stutz, Wieland North America's General Counsel, to Keith Stein at Synergy. DN 23-3. In that letter, Wieland requested that Synergy provide it "with an itemization of the time spent on these matters, as Synergy 'agree[d] to keep reasonable records

---

[2] Wieland disputes Synergy's methodology in calculating the value of approved incentives. *See* 1/20/22 Letter from Wieland North America General Counsel to Synergy, DN 23-3. The dispute concerning the value of the incentive packages need not be addressed since the Court concludes that the contingent fee provision for which this value would be relevant is void.

o[sic] the time spent on the engagement to substantiate the alternative compensation structure contemplated herein.'"   *Id.*   Synergy contends that the Kentucky statute "does NOT apply to, or impact the terms of the Engagement Letter…" and that it has been "advised that the Cabinet[3] and KEDFA[4] treat compensation for the services referenced in the Engagement Letter as a 'matter between the applicant and the consultant.'  The form of compensation is not a matter the for [sic] the Cabinet or KEDFA to consider."  11/19/21 Memorandum from Synergy to Mike Viscariello, Wieland Holdings, Inc. U.S. Tax Director, DN 1-2.

Wieland and Synergy reached an impasse.  Wieland has not paid Synergy for its services as Synergy has not provided time records to enable Wieland to determine what it owes based on an hourly rate.  Synergy has not provided the requested time records because it expects to be paid a contingent fee and contends that Wieland is in breach of the contract by failing to pay the invoices submitted to it.  The parties agree that they entered into a valid and binding contract[5] for Synergy's services and that Synergy, in fact, performed services under the contract for which it is entitled to payment.  They further agree that if the contingent fee provision is found void, Synergy is entitled to payment under the alternative payment provision.

III.    *Synergy's Motion to Dismiss*

Synergy contends that Wieland's Complaint for declaratory judgment fails to state a claim upon which relief can be granted and should therefore be dismissed pursuant to Fed.R.Civ.P. 12(b)(6). Synergy argues that Wieland's declaratory judgment claim is really just an affirmative defense and thus not a claim for relief.   Despite taking entrenched and diametrically opposed positions on the appropriate calculation of the sum due, Synergy insists

---

[3] Kentucky Cabinet for Economic Development, referred to herein as the "Cabinet" or "KCED."
[4] Kentucky Economic Development Finance Authority.
[5] With the exception of Wieland's challenge to the contingent fee provision.

that Wieland's declaratory judgment claim is not justiciable because it is not affiliated with a claim in the complaint which is viable under Kentucky law. Synergy's contention is incorrect for a number of reasons.

### A. Actual Controversy

First, Synergy contends that a declaratory judgment claim must be anchored to a main claim appearing in the Complaint. While Wieland must identify an "actual controversy," it is not required to affirmatively seek additional relief as Synergy suggests.

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  "[I]t now is well settled by a multitude of cases that the granting of a declaratory judgment rests in the sound discretion of the trial court exercised in the public interest." 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2759, at 645 (2d ed. 1983)["Wright & Miller"].  "'[T]he operation of the Declaratory Judgment Act is procedural only.' *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617, 108 A.L.R. 1000. Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S. Ct. 876, 879, 94 L. Ed. 1194 (1950).  The Act allows relief to be given "by way of recognizing the plaintiff's right even though no immediate enforcement of it was asked." *Id.*  The Act "gives a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a

coercive remedy and in cases in which a party who could sue for coercive relief has not yet done

so." Wright & Miller, *supra.*

> The remedy made available by the Declaratory Judgment Act and Rule 57 is intended to minimize the danger of avoidable loss and the unnecessary accrual of damages and to afford one threatened with liability an early adjudication without waiting until an adversary should see fit to begin an action after the damage has accrued. It relieves potential defendants "from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure—or never." It permits actual controversies to be settled before they ripen into violations of law or a breach of contractual duty and it helps avoid a multiplicity of actions by affording an adequate, expedient, and inexpensive means for declaring in one action the rights and obligations of litigants.

*Id.*

The Sixth Circuit has held that "[b]efore a federal court takes up a case's merits, it must

assure itself of its jurisdiction over the case's subject matter." *Miller v. Bruenger*, 949 F.3d 986,

990 (6th Cir. 2020), *citing Kroll v. United States*, 58 F.3d 1087, 1092 (6th Cir. 1995). "Where

'real and substantial facts' show that a declaratory judgment plaintiff has disputed a declaratory

judgment defendant's rights, thereby putting itself in a position legally adverse to the defendant

(and has maintained such position), there is clearly a substantial controversy between such

parties 'of sufficient immediacy and reality to warrant the issue of a declaratory judgment."

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604

(2007)(*quoting Maryland Casualty Co. v. Pacific Coal and Oil, Co.*, 312 U.S. 270, 273, 61 S.Ct.

510, 85 L.Ed. 826 (1941)).

Taking the allegations of the Complaint as true, as we must on a motion to dismiss under

Fed.R.Civ.P. 12(b)(6) and construing the pleading in the light most favorable to the Plaintiff,[6] we

have a sufficient showing here. A pleading must contain a "short and plain statement of the

claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78

---

[6] *See Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 561 (6th Cir. 1998).

(2009). The factual allegations in the pleading must be sufficient to raise the right to relief above the speculative level on the assumption that all the allegations in the Complaint are true. *Bell Atl. Corp.*, 550 U.S. at 555. The Plaintiff is not required to include detailed factual allegations, but the "plain statement" must "possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Bell Atl. Corp.*, 550 U.S. at 557.

The Complaint alleges that:

1. Wieland and Synergy entered into a contract for Synergy's services which provides for payment of a contingent fee or alternatively payment on an hourly basis for those services.  DN 1, ¶ ¶11; 15-17.

2. In 2021, a number of economic incentive packages were approved by the KEDFA, an agency within the Cabinet.  DN 1, ¶¶ 13-14.

3. In 2022, Synergy billed Wieland under the contingent fee provision, asserting that nothing in Kentucky law prohibits Synergy from receiving a contingent fee for its work.  DN 1, ¶ 21.

4. Wieland objected to the demand for payment on a contingent fee basis on the ground that such payment arrangements are in contravention of Kentucky public policy, as set forth in KRS 11A.233(4) and therefore the provision is void. DN 1, ¶¶ 18-19; 22.

5. Wieland has not paid the invoices received from Synergy. DN 1, ¶¶ 19; 23.

6. Synergy has failed to comply with Wieland's request that it provide time records and continues to demand payment from Wieland under the contingent fee provision.  DN 1, ¶¶ 20; 23.

There is clearly a real, substantial and immediate controversy between the parties over the appropriate calculation of compensation due. Certain work was done, incentive packages were approved, and payment was and remains due and owing. At the time of the filing of the Complaint for declaratory relief, Synergy was entitled to seek a coercive remedy, but had not yet done so. Simultaneously with the filing of its motion to dismiss, Synergy counterclaimed against Wieland for breach of the contract and continues to demand the payment of a contingent fee.

The parties agree that there is complete diversity among the parties as they are citizens of different states and they agree that the matter in controversy exceeds $75,000.00 exclusive of interests and costs, in satisfaction of the requirements of 28 U.S.C. § 1332 for diversity jurisdiction. DN 1, ¶ 6; DN 13, ¶¶ 3-4. Thus, "absent the availability of declaratory relief, the case could have [been] brought in federal court." *Miller,* 949 F.3d at 990-91, *citing* 15A James Wm. Moore et al., *Moore's Federal Practice – Civil* § 103.44 (2019); *Severe Records, LLC v. Rich*, 658 F.3d 571, 580 (6th Cir. 2011)(*quoting Stuart Weitzman, LLC v. Microcomputer Res., Inc.,* 542 F.3d 859, 862 (11th Cir. 2008). The Court has "analyze[d] the assumed coercive action by the declaratory judgment defendant" in reaching this conclusion. *Stuart Weitzman, LLC.* 542 F.3d at 862 *quoting Gulf States Paper Corp. v. Ingram,* 811 F.2d 1464, 1467 (11th Cir.1987), *abrogated on other grounds by King v. St. Vincent's Hosp.,* 502 U.S. 215, 217, 112 S.Ct. 570, 572, 116 L.Ed.2d 578 (1991).

### B. Viable Claim

Second, Synergy asserts that even if the existence of an unasserted claim is sufficient to bring a declaratory judgment claim within the court's jurisdiction, Wieland's declaratory claim must be shown to be viable or there is nothing for the Court to adjudicate. Synergy asserts that

Wieland fails to state a claim upon which relief can be granted as the statute does not provide a private right of action by a beneficiary of an incentive package against its agent.  Synergy goes to great lengths to address a lack of express or implied causes of action under KRS 11A.233, a statute found in Kentucky's Executive Branch Code of Ethics.

Subchapter 11A.233 begins by stating that a person acting to promote, oppose, or otherwise influence the outcome of a decision of the Cabinet or its agencies relating to the issuance or award of any components of an economic incentive package is not an "executive agency lobbyist" for purposes of the subchapter.  Thus such a person is exempt from the extensive registration and disclosure requirements imposed on lobbyists.  11A.233(1).  However, more limited disclosure provisions are mandated for such persons (11A.233(2) and (3)).  Additionally, 11A.233(4) states the following prohibition:

> No beneficiary of an economic incentive package as referred to in this section shall engage any person to influence decisions of the Cabinet for Economic Development or the approving board or authority for compensation that is contingent in any way on the outcome of the decisions of the cabinet or the approving board or authority regarding contracts or agreements specified in subsection (2) of this section, and no person shall accept any engagement to influence these decisions or conduct lobbying activities related to these decisions for compensation that is contingent in any way on the outcome of the decisions of the cabinet or the approving board or authority regarding these contracts or agreements.

The prohibition against the engagement of persons or the acceptance of an engagement for the payment of a contingent fee to influence decisions of the Cabinet is at the heart of this litigation as it is the statutory provision that Wieland relies upon in arguing that the contingent fee provision in the contract is void.

Synergy contends that Wieland raises a question of statutory interpretation in contending that KRS 11A.233(4) precludes it from paying Synergy a contingent fee.

10

Synergy notes that the Code of Ethics permits the Executive Branch Ethics Commission and the Kentucky Attorney General to investigate and address complaints of violations of the ethics rules,[7] and no provision recognizes a private civil cause of action by an aggrieved individual.  It also urges that no implied cause of action should be recognized in this instance as "implied causes of action have fallen out of favor."   DN 12, p. 5, PageID #44 (citing cases involving implied claims for constitutional violations analyzed under *Bivens*[8]).

However, Synergy's argument misconstrues the theory of Wieland's claim. The underlying claim, as framed by the Complaint, is essentially a garden variety contract claim. Wieland seeks to avoid paying Synergy pursuant to the contingent fee provision on the ground that this provision of the agreement is void as against the public policy of Kentucky.  Thus the argument that this is a case of statutory interpretation is a non-starter insofar as Synergy seeks to restructure Wieland's claim into something akin to an enforcement action, rather than the claim actually made by Wieland.  This action arose, after all, as a matter concerning the appropriate performance under the contract.  Additionally, Wieland alleges Synergy breached the contract when it improperly billed Wieland on a contingent fee basis and failed to provide time records to enable Wieland to make proper payment.  Synergy itself characterized the controversy as one sounding in contract when it claimed Wieland breached the contract by failing to pay the invoices.

Wieland contends that the public policy of Kentucky, evidenced by KRS 11A.233(4), precludes a term of the parties' engagement insofar as it provides for payment of a contingent fee for Synergy to influence decisions of the Cabinet on the award of incentive packages to Wieland. "It is beyond challenge that public policy is determined by the constitution and the legislature

---

[7] Citing KRS 11A.080(1)(b); 11A.030(5); 11A.090; 11A.100(2) and (3)(e); 11A.100(5); 11A.246.

[8] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

through the enactment of statutes.  *Giuliani v. Guiler*, 951 S.W.2d 318, 321 (Ky. 1997), *as modified on denial of reh'g* (Oct. 2, 1997).

> And 'absent a constitutional bar or command to the contrary, the General Assembly's pronouncements of public policy are controlling on the courts, as this Court has ruled countless times.' *Carter v. Bullitt Host, LLC*, 471 S.W.3d 288, 296 (Ky. 2015). And 'an act of the Legislature declaring the public policy on a certain question cannot in the nature of things be contrary to public policy.' *Peak v. Akins*, 237 Ky. 711, 36 S.W.2d 351, 352–53 (1931). This Court's judgment as to sound public policy is simply irrelevant when interpreting a statute and certainly cannot trump a statute's language.

*Murphy v. Commonwealth*, 500 S.W.3d 827, 832 (Ky. 2016).

The law is clear that "[c]ourts may void contracts that violate law or public policy. *Smith v. The Ferncliff,* 306 U.S. 444, 450, 59 S.Ct. 615, 83 L.Ed. 862 (1939); *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 438 (6th Cir.2008)."  *Martello v. Santana*, 713 F.3d 309, 313 (6th Cir. 2013).  In Kentucky, "a court may refuse to enforce a contract on grounds of illegality where the contract has a direct objective or purpose that violates the federal or state Constitution, a statute, an ordinance, or the common law." *Yeager v. McLellan,* 177 S.W.3d 807, 809 (Ky.2005) (citing *Zeitz v. Foley,* 264 S.W.2d 267, 268 (Ky.1954)); *Giuliani v. Guiler,* 951 S.W.2d 318, 321 (Ky.1997) ("In the absence of a legislative decree, courts may adopt and apply public policy principles ....") (citing *Owens v. Clemons,* 408 S.W.2d 642 (Ky.1966)).   In *Martello, supra,* the Sixth Circuit quoted the Restatement (Second) of Contracts § 178 noting that it supports the proposition that a contract term is unenforceable as against public policy "if legislation provides it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against enforcement of such terms." 713 F.3d at 313.

*C. Governing Law*

We must note here that the contract provides: "This Letter shall be governed, construed and enforced under the laws of the State of Illinois, giving no effect to the conflict provisions therein." DN 1-1, p. 5, PageID #11. The parties cite to Kentucky law to support their positions concerning whether a viable claim has been asserted in the Complaint, noting only that Wieland has looked to the Kentucky ethics statutes to challenge the contract's contingent fee provision. Synergy states in a footnote that "[t]he Court does not need to wade into potentially difficult choice-of-law issues at this juncture because Wieland's only claim relies solely on its erroneous interpretation of Kentucky law." DN 12, p. 3, fn 1, PageID #42. The parties have not explained why the choice-of-law provision may be overlooked. It would appear to apply to the question of whether the Court, sitting in diversity, is presented with a viable claim. Wieland urges that Kentucky courts would recognize its cause of action seeking to declare a provision of the contract void as against the public policy of Kentucky. The choice-of-law provision, however, provides that the contract is to be governed, construed and enforced under Illinois law. Therefore, it follows that this Court should look to Illinois law to discern whether, generally, a claim seeking to void a contract provision on grounds of violation of public policy is a recognized cause of action there. We find that, as in Kentucky, "[a]s a general rule, courts will not enforce a private agreement which is contrary to public policy [citations omitted]...Public policy is the legal principle that no one may lawfully do that which has a tendency to injure the public welfare. [citations omitted] The public policy of this state is reflected in its constitution, its statutes, and its judicial decisions. [citations omitted]." *Rome v. Upton*, 271 Ill.App.3d 517, 519-20 (1995). Kentucky an Illinois courts would find Wieland's claim to be viable. Therefore,

it is of no moment whether the parties have properly ascertained which law should be applied on this question.  The outcome of this motion is the same.

### D. Conclusion

In considering Synergy's motion to dismiss for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6), the Court assumes all well-pleaded facts as true and must determine whether the Complaint states a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  It is clear that Wieland's Complaint for declaratory relief easily meets the standard for articulation of a claim plausible on its face for the reasons stated.

Additionally, in determining whether this Court should exercise its discretion to entertain the request for declaratory relief, we note that a determination of the question raised by Wieland will be dispositive of the dispute.  As previously noted, the parties agree that Synergy is entitled to payment.  The issue before the Court is how the amount of the payment is to be calculated.[9] The motion of Synergy to dismiss the action will be denied.

### IV.     The Parties' Cross-Motions for Summary Judgment

### A.  Applicable Law

Wieland's motion for summary judgment contends that the contract's contingent fee provision should be declared void as violative of public policy when analyzed under either Kentucky or Illinois law.  Wieland does not mention the choice-of-law provision which states:

---

[9] The presence of secondary concerns which may or may not be in play at a later time, such as the maintenance of time records and the methodology employed for the calculation of a contingent fee, does not present an obstacle to this Court's exercise of jurisdiction in the case.

"This Letter shall be governed, construed and enforced under the laws of the State of Illinois, giving no effect to the conflict provisions therein."  DN 1-1, p. 5, PageID #11.  Arguing that the analysis should be one and the same under the law of either state, Wieland provides no choice-of-law analysis on this issue.

> Synergy attempts to be a bit more discerning, stating that

> [A]lthough Illinois law governs the interpretation of the Contract, the Kentucky statute concerning contingency fees is the only statute that could impact the contingency fee owed for incentives awarded by Kentucky.  The Illinois executive agency lobbying statute has no impact on *Kentucky* incentives, rendering the arguments about it in Wieland's motion for summary judgment irrelevant.

Synergy's Response/Cross-Motion for Summary Judgment, DN 22, p. 8, fn. 4, PageID #226 (emphasis in original).

Essentially, Synergy argues that Illinois law applies sometimes.  It states that "[u]nder principles of Illinois law, which govern the construction of the Contract, courts will not void a contractual provision on an alleged illegality ground unless the party seeking to avoid enforcement demonstrates that the provision at issue is 'clearly contrary' to the statute.  *Kane v. Option Care Enterprises, Inc.*, 2021 Ill.App. LEXIS 488, *8-9 (Ill.App. Sept. 8, 2021).[10]  *Kane* is the principal case upon which Wieland premises its argument that Illinois courts would find the contingent fee provision void as against the public policy of Illinois, and Synergy says we should not follow it.

There is no Kentucky law addressing KRS 11A.233(4).  The Sixth Circuit has indicated that

> In accordance with *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), when evaluating an undecided question of Kentucky law, a federal court sitting in diversity must make the " 'the best prediction, even in the absence of direct state precedent, of what the Kentucky Supreme Court would do

_____

[10] 194 N.E.3d 912, 457 Ill.Dec. 127 (2021).

if it were confronted with [the] question.' " *Managed Health Care Assocs., Inc. v. Kethan,* 209 F.3d 923, 927 (6th Cir.2000) (quoting *Welsh v. United States,* 844 F.2d 1239, 1245 (6th Cir.1988)). If the relevant state judiciary has not spoken to the issue, courts sitting in diversity should consider "all relevant data," *Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995), including jurisprudence from other jurisdictions, *Lexington Insurance Co. v. Rugg & Knopp, Inc.,* 165 F.3d 1087, 1090 (7th Cir.1999).

*Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004).

In making "an educated '*Erie* guess,'" the Sixth Circuit in *Combs* looked to the law in other jurisdictions, the language of the statute itself, and the purpose behind such statutes generally in reaching its conclusion in a "highly uncertain area of state law." *Id.* This Court will do the same. Thus, while not binding on us, we will consider Illinois law, in part, in our analysis.

### B. Summary Judgment Standard

Before granting a motion for summary judgment, the Court must find that "there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]here the moving party has the burden—the plaintiff on a claim for relief or defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (internal quotations and emphasis omitted).

The Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must show that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence ... of a genuine dispute[.]" Fed. R.

Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When both parties move for summary judgment, this Court "must evaluate each motion on its merits and view all facts and inference in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

The parties agree that there is no genuine issue of material fact which would preclude the Court from granting summary judgment and they each contend that they are entitled to judgment as a matter of law.

Under both Kentucky and Illinois law, construction and interpretation of a contract are questions of law to be decided by the court. *See Ward v. Taylor*, 2009 WL 1203949, *5 (Ky.App. May 1, 2009)(citing *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky.App. 2001); *Premier Elec. Constr. Co. v. Ragnar Benson, Inc.*, 444 N.E.2d 726, 732 (Ill.App. 1982)(citing *Illinois Valley Asphalt, Inc. v. LaSalle National Bank* (1977), 54 Ill.App.3d 317, 319–20, 369 N.E.2d 525, 528).


### C. Undisputed Material Facts

A critical question which the Court must first decide is what facts constitutes the undisputed material facts upon which we should decide the case.

Wieland contends that the Court need only consider KRS 11A.233(4) to discern the public policy of Kentucky and the language of the contract to determine that the contingent fee provision is void as against that public policy. It focuses on certain words in the statute-- "shall not engage any person" and "no person shall accept any engagement" –to support its argument

that the Court should focus solely on the terms of the contract.  As the statute prohibits the *engagement* of a person or the acceptance of an *engagement* to influence the Cabinet for a contingent fee, Wieland argues that we must assess whether the contract, its engagement with Synergy, runs afoul of the statute.

Synergy counters that the Court must look to the full scope of the work done in order to properly analyze the issue.  It concedes that Wieland's position would make sense if the parties were asking the Court to interpret the language of the contract and it would thus look within the four corners of the document to determine its meaning.  Synergy contends, however, that the question before us is whether the statute applies to preclude a contingent fee for Synergy's work. DN 22, p. 10, PageID #228.  Synergy has filed a Declaration of Stein (DN 23-1) in which he recounts the work he did on behalf of Wieland and argues that nothing Synergy did amounts to influencing KCED incentive package decisions.  Wieland does not controvert these "facts," but rather challenges their relevance to the issue at hand.  Wieland does not discuss the declaration in its briefs as the work done is, in Wieland's view, irrelevant to the analysis of the parties' engagement.  Synergy insists that "the question of whether Synergy was engaged to do something doesn't end with the engagement letter entered into at the outset…Whether Wieland 'engaged' Synergy to conduct lobbying activity depends on what Synergy *was actually doing* over the course of the engagement." *Id.* (emphasis in original).

We conclude that the analysis must be confined to the statute and the terms contained within the four corners of the contract. The terms "engage" and "engagement" are defined in the KRS Chapter 11A.  In KRS 11A.201, "'engage' means any arrangement, and  'engagement' means arrangement, whereby an individual is employed or retained for compensation to act for or on behalf of an employer…" 11A.201(4).  A plain reading of this language evidences that an

"engagement," for our purposes, is the contract; that is, the arrangement whereby Wieland employed Synergy to act on its behalf.  What Synergy *actually did*, whether consistent with the terms of the engagement or not, does not matter.

We discern this meaning of "engagement" under traditional rules of contract interpretation.  "We must look first to the plain language of the statute and, if it is clear, our inquiry ends."  *Seeger v. Lanham*, 542 S.W.3d 286, 291 (Ky. 2018)(citing *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005). We are "to ascertain the intention of the legislature from words used in enacting statutes rather than surmising what may have been intended but was not expressed." *Stopher v. Conliffe,* 170 S.W.3d 307, 309 (Ky.2005), *overruled by Hodge v. Coleman*, 244 S.W.3d 102 (Ky. 2008).  "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."  *United States v. Plavcak*, 411 F.3d 655, 660 (6th Cir. 2005)(*citing Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979)). "The common meaning of words is often determined by reference to dictionary definitions."  *Dept. of Rev., Fin., and Admin. Cabinet v. Shinin' B Trailer Sales, LLC*, 471 S.W.3d (Ky.App. 2015)(citing *Jefferson Cnty. Bd. od Educ. V. Fell*, 391 S.W.3d 713, 719 (Ky. 2012).  Statutes must be "read as a whole and in context with other parts of the law." *Lewis v. Jackson Energy Co-Op Corp.*, 189 S.W.3d 87, 92 (Ky.2005).

Based upon these principles, we reject the defendant's contention that the entire course of performance constitutes the "engagement" to which the statute refers. While "engagement" may, under some circumstances, describe a course of conduct over time, that is not what is meant here. We are obliged to use the meaning the statute conveys.[11]

---

[11]While a word may have more than one meaning, that fact does not necessarily result in an ambiguity in a statute. There is no ambiguity in a statute if the definition of the term, when read in context, is clear.

"Engage" and "engagement" appear in the same definition (11A.201(4)).  The definition in its entirety states:

> "Engage" means to make any arrangement, and "engagement" means arrangement, whereby an individual is employed or retained for compensation to act for or on behalf of an employer to influence executive agency decisions or to conduct any executive agency lobbying activity

"Engage" is used as a transitive verb meaning "to make an arrangement." Engagement" is the arrangement thus made, a noun.  If "engagement" was intended to mean a course of performance as suggested by Synergy, the legislature would have given the term its own definitional paragraph. As written, "engage" and "engagement" are of a piece and are limited to an agreement to employ.

The Court will decline to consider the declaration of Keith Stein insofar as it is offered for the purpose of determining whether the parties' engagement contravenes KRS 11A.233(4). We will instead focus on the language of the contract.  We note that this approach was taken in an Illinois case addressing a similar argument.  The court explained its reason for focusing on the contract rather than the performance.

> Even when there is no evidence that impropriety has occurred, contingent-fee lobbying arrangements are condemned because of their tendency to promote impropriety. *E.g.*, 917 *Marshall v. Baltimore & Ohio R.R. Co.*, 57 U.S. (16 How.) 314, 336, 14 L.Ed. 953 (1853).

*Kane v. Option Care Enterprises, Inc.*, 2021 IL App (1st) 200666, ¶ 10, 194 N.E.3d 912, 916–17, *reh'g denied* (Oct. 15, 2021), *appeal denied,* 184 N.E.3d 994 (Ill. 2022).  The *Kane* court followed an earlier Illinois decision, *Rome v. Upton*, 271 Ill.App.3d 517, 520, 208 Ill.Dec. 163, 648 N.E.2d 1085, 1088 (1995).  In *Rome*, the court held that the "tendency" rationale applied in all instances to void the agreement, regardless of the circumstances.  The court noted that it was immaterial that there was no evidence of an express contemplation of the use of personal

influence.  *Kane*, 194 N.E.3d at 918, citing *Rome*, 648 N.E.2d at 1088.  In *Kane* the court held the contingent fee contract was void for public policy reasons because of its tendency to encourage the use of improper means to influence the legislature:

> The promise of a contingent fee " 'is a direct and strong incentive to the exertion of not merely personal but sinister influence.' " *Id.* (quoting *In re Browning*, 23 Ill. 2d 483, 494, 179 N.E.2d 14, 19 (1961))… " 'It matters not that nothing improper was done or was designed to be done by the plaintiff. It is enough that such is the tendency of the contract \*\*\*.' " (Emphasis omitted.) *Rome*, [648 N.E.2d at 1088] (quoting *Crichfield v. Bermudez Asphalt Paving Co.*, 174 Ill. 466, 482, 51 N.E 552, 557 (1898)). The court stated, "We would not expect a party to announce its contemplation or use of 'sinister influences' against public bodies." *Rome*, 271 Ill. App. 3d at 521, 208 Ill.Dec. 163, 648 N.E.2d 1085.

*Kane,* 194 N.E.3d at 918-19, quoting *Rome*, 648 N.E.2d at 1088.

### D.  KRS 11A.233(4)

#### 1.  The Language

Wieland contends that KRS 11A.233(4) "expressly forbids contingency-fee arrangements between the recipient of any economic incentive award by [KCED] and its subsidiary boards and authorities, and any person who performs work to influence or lobby the KCED toward securing that incentive…"  DN 16, p. 1.  Synergy counters that "the payment of a contingency fee does not run afoul of KRS 11A.233(4)" and "does not prohibit the payment of a contingency fee here…The statute in dispute, KRS 11A.233, carves out economic-development benefits lobbying from other executive agency lobbying and creates a more limited set of rules for that type of lobbying work.  But Synergy did not perform economic development lobbying, such as seeking to 'influence' the Cabinet for economic development."  DN 22, p. 1.

The parties agree that the Court must discern the intent of the legislature and give it effect.  We look to the words of the statute, giving theme their plain and ordinary meaning.

21

> "All parts of the statute must be given equal effect so that no part of the statute will become meaningless or ineffectual." *Lewis,* 189 S.W.3d at 92. "One of the most basic interpretative canons" of statutory interpretation is that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Corley v. United States,* 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) (quoting *Hibbs v. Winn,* 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (internal citation omitted) ). "We presume ... that the General Assembly intended for the statute to be construed as a whole and for all its parts to have meaning." *King Drugs, Inc. v. Commonwealth,* 250 S.W.3d 643, 645 (Ky. 2008) (citing *Lewis,* 189 S.W.3d 87).

*Travelers Indem. Co. v. Armstrong*, 565 S.W.3d 550, 563 (Ky. 2018).

Synergy contends that its understanding of subsection (4) of 11A.233 comes from a broader view of that subsection in a larger statutory context. Synergy insists that the subsection applies only to lobbying activities, not to tax-consulting services such as are provided by Synergy. DN 22, p. 9.

Wieland takes issue with Synergy's narrow view of the statutory language, finding that Synergy conflates "influencing" and "lobbying" in its analysis in order to confine its application to lobbyists. Wieland argues that "[b]y including both terms, the General Assembly clearly intended for the words to have different meanings." *Shinin' B Trailer Sales*, 471 S.W.3d at 312. It does not indicate how these definitions differ but urges that "to influence" has a "broader meaning." DN 28, p. 10-12. It notes that the prohibition in 11A.233(4) applies to "persons," not just to "executive agency lobbyists" as suggested by Synergy. *Id.*

The Court finds both of these analyses to be slightly off the mark. Neither party's argument remains true to the canon that statutes must be read as a whole and in context with other parts of the law. *Lewis, supra.*

The Court noted earlier in this opinion that KRS 11A.233(1) does, indeed, exclude persons acting to "promote, oppose, or otherwise influence the outcome" of KCED decisions on incentive packages from the definition of "executive agency lobbyist" and the rules and

requirements relating to them.  However, the statute imposes in their place a less stringent set of rules and requirements in the subsequent subsections.  It requires that the beneficiary of an incentive package provide a disclosure statement (11A.233(2) and (3)).  It also states, in pertinent part, that

> (1) No beneficiary of an economic incentive package [ie. Wieland] shall engage any person [Synergy or anyone else] to influence decisions of [KCED and its agencies] for compensation contingent in any way on the outcome of [such] decisions; and

> (2) No person [Synergy or anyone else] shall accept any engagement to influence those decisions [by KCED and its agencies] or conduct lobbying activities related to those decisions for compensation contingent in any way on the outcome of [such] decisions.

The first clause is directed at beneficiaries of incentive packages, prohibiting them from engaging anyone on a contingent basis to influence the decisions of KCED and its agencies with respect to economic incentive packages.  As noted by Synergy, by its terms, this portion of the statute does not preclude the beneficiary from engaging persons to influence the decisions of KCED unless the engagement is on a contingent basis.

The second clause is directed at those whose services are sought by companies such as Wieland to assist in obtaining incentive packages from the Commonwealth.  The rule makes clear that no such person may accept an engagement for a contingent fee to influence the decisions of KCED and its agencies or conduct lobbying activities related to these decisions for a contingent fee.

The clauses are written in parallel language concerning the parties' engagement. A beneficiary may not engage and a service provider may not accept a contingent fee engagement to influence KCED incentive package decisions. Additionally, a service provider may not conduct lobbying activities related to KCED incentive package decisions for a contingent fee.

Synergy contends that the prohibition on contingent fees relates solely to lobbying activities. It does not acknowledge a distinction between an engagement to influence KCED decisions from lobbying for them. Synergy is correct that it is prohibited from receiving a contingent fee for lobbying KCED in relation to incentive package decisions. But that is only one aspect of the prohibition and not the one upon which Wieland focuses. The acceptance of a contingent fee engagement to influence KCED incentive package decisions is also prohibited. Thus we must focus not on whether Synergy conducted "lobbying activity" but rather on the question whether the parties entered into an "engagement to influence" KCED incentive package decisions.

### 2. The Context

Synergy focuses on "lobbying activity" because it seeks to distinguish itself and its work by referring to the definition of "executive agency lobbying activity" found in KRS 11A.201. The term "influence" is not defined anywhere in the chapter. KRS 11A.201(10)(a) defines "executive agency lobbying activity" as "contacts made to promote, advocate, or oppose the passage, modification, defeat, or executive approval or veto of any legislation or otherwise influence the outcome of an executive agency decision by direct communication with…any executive agency official…or a member of the staff of any one (1) of the officials listed in this paragraph." KRS 11A.201(10)(b) excludes from "executive agency lobbying activity"

"[p]rofessional services in preparing executive agency decisions, preparing arguments regarding executive agency decisions, or advising clients and rendering opinions regarding proposed pending executive agency decisions if the services are not otherwise connected to lobbying…" KRS 11A.201(10)(b)(7).

Synergy points out that the definition of "executive agency lobbying activity" includes influencing but excludes merely advising clients and providing opinions regarding executive agency decisions.  Synergy purports to have done only the latter for Wieland and argues that the contingent fee prohibition therefore does not apply to it as it did not conduct "lobbying activity." However, subsection (7) states, in full, that activity such as advising clients, rendering opinions, and preparing arguments regarding executive agency decisions is not "lobbying activity" **unless it is otherwise connected to lobbying activity**.  Thus Synergy's argument is that its actions fit pristinely within the non-lobbying activities set out in subsection (7) for which it contends it may receive a contingent fee.

"Lobbying activity" under 11A.201 includes direct contacts with an executive agency official or staff member made to "promote" or "advocate" or "otherwise influence" an executive agency decision.  11A.233 is directed to persons who are non-lobbyists by definition but who may be engaged to influence KCED's incentive package decisions.  11A.233(4) makes clear that such an engagement on a contingent basis is precluded.  Synergy contends that 11A.233 is directed only at lobbyists dealing with the Cabinet, defining them out of the category of "executive agency lobbyists" solely for the purpose of cutting them a break on reporting requirements.  Synergy's argument suggests a distinction without any practical difference. Those who are not, by definition, "lobbyists," but otherwise act like lobbyists because they are conducting "lobbying activity" related to KCED incentive package decisions, may not engage in

such lobbying activity for a contingent fee.  In other words, lobbying activity for a contingent fee

is prohibited whether you are an "executive agency lobbyist" or not.  11A.233(4) indicates that,

in the case of those persons who deal with KCED, the same prohibition articulated in the general

statute, KRS 11A.236, applies that

> [N]o person shall engage any persons to influence executive agency decisions or
> conduct executive agency lobbying activity for compensation that is contingent in
> any way on the outcome of an executive agency decision, including payment
> based on the awarding of a contract or payment of a percentage of a government
> contract awarded, and no person shall accept any engagement to influence
> executive agency decisions or conduct executive agency lobbying activity for
> compensation that is contingent in any way on the outcome of an executive
> agency decision, including payment based on the awarding of a contract or
> payment of a percentage of a government contract awarded.

Our reading of the statute, which acknowledges two prohibitions concerning contingent

fees rather than just one, gives effect to all terms in the statute and reads them in context with

other parts of the law.   More importantly, it avoids rendering any part inoperative, or

superfluous, void or insignificant.  *Corley*, *supra.*  In keeping with the principle that every word

in a statute has some meaning, it makes sense to conclude that the two commands that no person

"accept any engagement to influence these decisions" or "conduct lobbying activities related to

these decisions" address distinct conduct – the acceptance of a prohibited engagement and the

performance of prohibited activity.

### 3.  *Grammar Rules*

Our reading of the statute is sound under the rules of English grammar as well.  The

sentence contains a compound predicate – two or more verbs "(accept" and "conduct") sharing a

single subject ("person"), and thus there is no comma preceding the second part of the compound

predicate.  § 1.4(b) *The Redbook, A Manual of Legal Style, 4th Ed.*, Garner, B.A., West Academic

Publ. (2018).   We find parallel construction ("accept any engagement to influence these decisions" and "conduct lobbying activities related to these decisions") on both sides of the "or," a coordinating conjunction.   § 5.12(b) *Manual on Usage & Style*, Tex.L.Rev. (14th Ed);   §§ 5.198, 6.22 *Chicago Manual of Style, 17th Ed.*, Univ. of Chicago Press (2017).

### 4.   *Hypothetical Problems*

Finally, our reading provides an answer to Synergy's query concerning whether an engagement could be written around the statute.   Synergy postulates that if the focus is kept on the language of the contract, it could be written so vaguely that the parties avoid promising a contingent fee, but influencing KCED decisions for a contingent fee would not be prohibited. Finding  both the engagement and the action precluded would eliminate the manipulated result Synergy suggests.

### 5.   *Legislative History*

The parties cite to legislative history concerning the enactment of Section 233 to Chapter 11A in 1994 and to cases recognizing that a court may look to legislative history in support of its interpretation of statutory language made in accordance with the basic canons of construction. *MPM Fin. Group, Inc. v. Morton*, 289 S.W.3d 193, 199 (Ky.2009).   Section 233 was enacted in response to the need to maintain the identities of applicants for economic incentives "in strict confidence."   Noting that these applicants are often "dealing with several states," the sponsor of Section 233 noted: "If they had to comply with the law as written they would basically be telling the world who their customers are."   DN 16-2, Transcript, Ky. House Legis. Sess. 15:23-16.19 (Feb. 25, 1994).  Synergy explains

Section 11A.233 was created to remove persons lobbying for economic-development awards from the standard disclosure rules applicable to executive agency lobbying, which were problematic because they would have required the public disclosure, early in the process, of the identity of companies potentially considering locating major projects in Kentucky. *See* Ky. House Rep. Leg. Sess. At 17:20 (2/25/1994). The purpose of the exception was to shield lobbyists and businesses from the reporting requirements that could have jeopardized those businesses' strategic decisions and hindered economic development overall in the Commonwealth. *Id.* In lieu of the full requirements for executive agency lobbyists, persons lobbying the Cabinet for Economic Development would be subject only to more limited rules set forth in KRS 11A.233, including the contingency-fee prohibition in Subsection 4.

This complete statutory framework shows that the provisions of KRS 11A.233 are concerned with regulating lobbying activity in the context of economic incentives through the Cabinet, even though Subsection 1 excludes such activity from the official definition of "executive agency lobbyist." *See generally* KRS Chapt. 11A. This context is important, as Synergy is a tax consulting company and is not in the business of lobbying executive agencies to influence their decisions. Subsection 4 therefore does not apply to Synergy's work for Wieland.

DN 22, pp. 12-13.

The parties agree that the purpose in adding Section 233 was to provide some measure of confidentiality to applicants seeking economic incentive packages from KCED by defining out of the definition of "executive agency lobbyist" those who represent them in the process (KRS 11A.233(1)). But 11A.233 added disclosure requirements in an abbreviated form (KRS 233(2) and (3)). KRS 11A.233(4) was also added, holding applicants and those who represent them before KCED bound to the same prohibition found in KRS 11A.236 on the engagement of persons to influence executive agency decisions and the conduct of executive agency lobbying activity for compensation contingent upon the outcome of such decisions.

E. *Historical References and Treatment of Prohibitions in Kentucky and Other Jurisdictions*

1. *Governing Principles*

Such prohibitions on contingent compensation for lobbying activity are common. Lobbying activity has always existed in state legislatures and has been formally regulated for decades.

> By 1951, "thirty-eight states and Alaska regulate[d] lobbies by law other than those laws forbidding bribery." Id. Today, every "state in the union ... has enacted legislation regulating the conduct of those who 'lobby' the state's legislative or executive officials." *Florida League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 458 (11th Cir. 1996) (footnote omitted). Many states have requirements similar to the federal lobbyist registration requirements, and "the trend at both the national and state levels is for greater disclosure and tighter oversight of lobbying activities." William P. Horn, Introduction to the Legislative Process, in The Legislative Labyrinth: A Map for Not-for Profits 51 (Walter P. Pidgeon, Jr., ed., 2001). "State lobby laws generally apply to the state legislature, the executive branch (including state agencies), or both." Chip Nielsen et al., State Lobby and Gift Laws, in Corporate Political Activities 2005: Complying with Campaign Financing, Lobbying & Ethics Laws 663 (Jan Witold Baran, et al. eds., 2005) (emphasis omitted). See generally Lobbying, PACs, and Campaign Finance: 50 State Handbook (Peter C. Christianson et al. eds., 2003) (setting forth, state-by-state, registration rules, reporting requirements, and prohibited activities).

Vincent R. Johnson, *Regulating Lobbyists: Law, Ethics, and Public Policy*, 16 Cornell J.L. & Pub. Pol'y 1, 56 (2006). The foundational principles underlying states' self-regulation remain firmly fixed in established law. As recounted in *Midway Leasing, Inc. v. Wagner Equipment Co.*, 842 Fed.Appx. 209, 212-24 (10th Cir. Jan. 8, 2021)(unpubl.),

> By 1876, the common law prohibited enforcement of contingency-fee agreements for legislative lobbying. *See* Thomas M. Susman and Margaret H. Martin, *Contingent-Fee Lobbying*, *in The Lobbying Manual: A Complete Guide to Federal Lobbying Law and Practice* 669, 676 (William V. Luneburg et al. ed., 4th ed. 2009) ("The early Supreme Court decisions ... primarily relied on federal common law to hold the contingent-fee lobbying arrangements void and unenforceable."); *accord* Jack Maskell, Cong. Rsch. Serv., *Lobbying Congress: An Overview of Legal Provisions and Congressional Ethics Rules* 11–12 (2007). For example, the Supreme Court had held that a plaintiff could not recover a contingency fee for lobbying in support of a right of way, explaining that "[a]ll

contracts for a contingent compensation for obtaining legislation ... [were] void by the policy of law." *Marshall v. Baltimore & O.R. Co.*, 57 U.S. (16 How.) 314, 336, 14 L.Ed. 953 (1853). The Court later repeated the prohibition on enforcing contingency-fee contracts to "procure favors from legislative bodies." *Providence Tool Co. v. Norris*, 69 U.S. (2 Wall.) 45, 55, 17 L.Ed. 868 (1864); *see Hazelton v. Sheckels*, 202 U.S. 71, 79, 26 S.Ct. 567, 50 L.Ed. 939 (1906) (noting that the Supreme Court had said in *Providence Tool Co.* that "all contracts for a contingent compensation for obtaining legislation were void")…

Despite the modern era's acceptance of paying lobbyists to influence legislation, we cannot assume that the Supreme Court would overrule its opinions prohibiting contingency-fee agreements for legislative lobbying. *Rodriquez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Courts of appeals have thus continued to recognize the Supreme Court's century-old prohibition. *See Fla. League of Pro. Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996) (stating that Supreme Court precedents continue to hold "that contracts to lobby for a legislative result, with the fee contingent on a favorable legislative outcome, were void *ab initio* as against public policy"); *Luff v. Luff*, 267 F.2d 643, 646 (D.C. Cir. 1959) ("Contingent fee arrangements, conditioned on the obtaining of favorable legislation, are unenforceable in the courts."); *Browne v. R & R Engineering Co.*, 264 F.2d 219, 222 (3d Cir. 1959) (noting the existence of "[a] judicially enforced public policy against contingent fees for obtaining legislation")…

[N]one of them cast doubt on the continuing vitality of *Marshall* and *Providence Tool…* In our view, the Supreme Court hasn't retreated from its nineteenth-century opinions prohibiting enforcement of contingency-fee agreements for legislative lobbying.

Courts continue to cite *Hazelton v. Sheckels*, 202 U.S. 71, 79, 26 S.Ct. 567, 50 L.Ed. 939 (1906) in which the United States Supreme Court held a contract for the sale of land unenforceable.  The contract required, in part, that the plaintiff bring the property to the attention of the committees of Congress as a suitable and appropriate site for a hall of records.  The Supreme Court reasoned that the contract was, in substance, a contingent fee contract.  Noting that "the validity of the contract depends on the nature of the original offer, and, whatever their form, the tendency of such offers is the same," the Court stated:

The objection to them rests in their tendency, not in what was done in the particular case. Therefore a court will not be governed by the technical argument that when the offer became binding, it was cut down to what was done, and was

> harmless. The court will not inquire what was done. If that should be improper, it
> probably would be hidden, and would not appear. In its inception, the offer,
> however intended, necessarily invited and tended to induce improper solicitations,
> and it intensified the inducement by the contingency of the reward. *Marshall* v.
> *Baltimore & O. R. Co.* 16 How. 314, 335, 336, 14, L. ed. 953, 962, 963.

*Hazelton*, 202 U.S. at 79. *Hazelton* clearly supports this Court's determination that it is contract

terms rather than the defendant's performance that must be scrutinized. The Supreme Court held

that "[t]he general principle was laid down broadly in *Providence Tool Co.* v. *Norris*, 2 Wall. 45,

54, 17 L. ed. 868, 870, that an agreement for compensation to procure a contract from the

government to furnish its supplies could not be enforced, irrespective of the question whether

improper means were contemplated or used for procuring it. *McMullen* v. *Hoffman*, 174 U. S.

639, 648, 43 L. ed. 1117, 1121, 19 Sup. Ct. Rep. 839." *Id.* Acknowledging that "there is no

real difference in principle between agreements to procure favors from legislative bodies, and

agreements to procure favors in the shape of contracts from the heads of departments" citing 2

Wall. 55, 17 L. ed. 870, the Court held that "all contracts for a contingent compensation for

obtaining legislation were void." *Id.* (citing *Marshall v. Baltimore & O.R.Co.*, 16 How. 314, 336,

14 L.Ed. 953, 962 (1853) and cases cited therein).


### 2. Kentucky's Treatment

*Hazelton* was relied upon by the Supreme Court of Kentucky in finding the Kentucky

Code of Legislative Ethics and the Executive Branch Code of Ethics constitutional. *Associated*

*Industries of Kentucky v. Commonwealth*, 912 S.W.2d 947 (Ky. 1995). In upholding the

contingent fee prohibition, KRS 11A.236(1), the court cited *Hazelton*, noting "Such acts as

enumerated above are against public policy and are void." *Assoc. Indus.*, 912 S.W.2d at 951.

The Court concluded that "[t]he Commonwealth of Kentucky has a compelling interest in

insuring the proper operation of a democratic government and deterring corruption, as well as the appearance of corruption.  This, we hold, is demonstrative of the most important of interests and employs means, closely drawn, to avoid unnecessary abridgment of associational freedom." *Id.*

### 3.  Under Illinois Law

We would be remiss if we failed to mention that *Kane, supra.,* engaged in a similar analysis.  In considering a contract and arguments very similar to those before this Court, the First District Appellate Court of Illinois stated, "Even when there is no evidence that impropriety has occurred, contingent-fee lobbying arrangements are condemned because of their tendency to promote impropriety." *Kane*, 194 N.E.3d at 916-17 (citing *Marshall v. Baltimore & O.R. Co., supra.* that "All contracts for a contingent compensation for obtaining legislation or to use personal or any secret or sinister influence on legislators, is void by the policy of the law."); *Providence Tool Co. v. Norris*, 69 U.S. (2 Wall.) 45, 49, 17 L.Ed. 868 (1864)).  Following binding Illinois authority, the *Kane* court found that "the tendency rationale has been applied to cases like this since at least the mid-nineteenth century,"  concluding, for reasons we explore in greater detail later in this opinion, that the contingent fee provisions of the parties' contract was void and unenforceable.  Quoting *Rome v. Upton*, 271 Ill.App.3d 517, 521, 208 Ill.Dec. 163, 648 N.E.2d 1085 (1995), the *Kane* court noted "It matters not that nothing improper was done or was designed to be done by the plaintiff.  It is enough that such is the tendency of the contract…We would not expect a party to announce its contemplation or use of 'sinister influences' against public bodies." *Kane*, 194 N.E.3d at 919.  In *Rome v. Upton,* the Illinois court stated rather colorfully, "It is not necessary that improper influences should have been used in a particular case to affect such a contract with nullity.  The law looks to the general tendency of things; it

opposes the beginnings of evil; it shuts the door against temptation by sweeping rules, which admit of no evasions."  648 N.E.2d 1085, 1088) quoting *Crichfield v. Bermudez Asphalt Paving Co.* (1898), 174 Ill. 466, 479, 51 N.E. 552).

### 4.  Other Jurisdictions

Similarly, the Court of Special Appeals of Maryland in a case involving the review of a suspension by the State Ethics Commission stated, "Even if Bereano did not actually perform lobbying or other services initiating the contingency provisions of the Fee Agreement, we are not persuaded that the Commission erred in finding him in violation of S.G. § 15–713(1). As explained above, the legislature sought to prohibit 'regulated lobbyists' from 'being engaged,' *i.e.,* contracting, for lobbying purposes for compensation that was contingent upon legislative or executive  action."  *Bereano v. State Ethics Comm'n*, 174 Md. App. 146, 174, 920 A.2d 1137, 1153 (2007), *rev'd,* 403 Md. 716, 944 A.2d 538 (2008).  The court explained, "In support of our interpretation that the legislature sought to prohibit the mere *contracting* for lobbying purposes for contingency fee compensation, we note that, in enacting the Public Ethics Law, the General Assembly 'declare[d] that the people have a right to be assured that the impartiality and independent judgment of those officials and employees will be maintained,' and found it 'evident that this confidence and trust is eroded when the conduct of the State's business is subject to improper influence or even *the appearance of improper influence.'"* S.G. § 15–101(a)." *Id.* at 1154 (emphasis in original).

5.   *Contrary Positions*

In *Florida League of Professional Lobbyists, Inc. v. Meggs*, 87 F.3d 457 (11th Cir. 1996), the Court of Appeals for the Eleventh Circuit, citing the case of *Montana Auto. Ass'n v. Greely,* 193 Mont. 378, 632 P.2d 300, 308 (1981), noted that there is some support for the contention that "the extensive, interim developments of First Amendment law establish…that the Supreme Court today would strike a contingency-fee ban on lobbying." *Meggs*, 87 F.3d at 462. The *Greely* court held that

> The blanket prohibition against contingent compensation of lobbyists provided by [the Montana statute] is overbroad because it precludes contingent fee arrangements that are properly motivated as well as those that are improperly motivated…We find that [the statute] unduly infringes the rights of those who, while contemplating neither illegal nor unethical conduct, need or desire to employ a lobbyist on a contingent fee basis in order to advance their interests before a public official.  The State may not impose so broad a limitation on the right to petition.

632 P.2d at 308.  *See also*, 35 Harv. J. on Legis. 559, Fatka, S. and Levien, J., *Protecting the Right to Petition: Why a Lobbying Contingency Fee Prohibition Violates the Constitution* (Summer, 1998)("Courts have been hesitant to follow *Montana Automobile Ass'n v. Greely*. Much of this hesitation stems from a commitment to follow Supreme Court precedent, rather than a disagreement over the reasoning that a contingency fee ban is unconstitutional."). However, we agree with the *Meggs* court's conclusion that we must "continue to follow directly applicable precedent that rests on reasoning seemingly rejected in analogous cases, 'leaving to [the Supreme] Court the prerogative of overruling its own decisions.' [*Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 482–86, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989)]." *Meggs*, 87 F.3d at 462.  Additionally, the Supreme Court of Kentucky has found the general contingency fee prohibition (KRS 11A.236) constitutional, relying upon *Hazelton* which remains binding Supreme Court precedent for the proposition that contracts for a

34

contingent compensation for procuring legislation or securing contracts from the heads of departments are void, irrespective of the intent of the parties or actions actually taken.


   F.   *"Influence"*

Wieland may not "engage any person to influence decisions of the Cabinet…for compensation that is contingent…on the outcome of the decisions…" Synergy may not "accept any engagement to influence these decisions…for compensation that is contingent…on the outcome of the decisions…" 11A.233(4).

We look to the plain meaning of the term "to influence." We find some guidance in a number of dictionary definitions of the term. *Webster's II New College Dictionary* (1995) defines "to influence" as "[t]o cause a change in the character, thought or action of." *Id.* at 569. *Pettway v. Commonwealth*, 470 S.W.3d 706, 708 ( Ky. 2015). *Merriam-Webster's Dictionary*, https://www.merriamwebster.com/dictionary defines "to influence" as "to affect or alter by indirect or intangible means" or "to have an effect on the condition or development of." The *Cambridge Dictionary* defines "to influence" as "to affect or change how someone or something develops, behaves, or thinks; to cause someone to change a behavior, belief, or opinion, or to cause something to be changed." *Black's Law Dictionary* defines "to influence" as "to affect, modify or act upon by physical, mental or moral power, especially in some gentle, subtle, and gradual way." *Va. Soc'y for Human Life v. Caldwell*, 152 F.3d 268, 270 (4th Cir. 1998).

The parties do not dispute the plain and ordinary meaning of the term "to influence." Synergy contends that it was not engaged to influence KCED decisions, but instead operated as "a mere conduit of information" rather than a lobbyist or influencer of outcomes. Wieland contends that Synergy was clearly engaged to influence the Cabinet's decisions on Wieland's

behalf, as evidenced by the terms of the contract, and the agreement to pay a contingent fee when the incentive packages were finalized violates the prohibition on such engagements.  This is not a dispute over what it means "to influence."  The parties dispute whether their engagement meets the definition. That question will be answered in due course.

### G.  Disjunctive Language

As noted earlier in the opinion, Wieland stated that the use of the word "or" between clauses indicates that "influence" and "lobbying activity" have different meanings.  Without further elaboration, it notes only that "influence" is a "broader" term.  By contrast, Synergy contends that the legislature wrote redundancy into the statute because "influence" is "part of the definition of 'executive agency lobbying.'"

In *Hall v. Hospitality Resources, Inc.*, 276 S.W.3d 775 (Ky. 2009), the Supreme Court of Kentucky stated, "It is a basic principle of statutory construction that terms joined by the disjunctive 'or' must have different meanings because otherwise the statute or provision would be redundant."  276 S.W.3d at 784 (citing *United States v. Hill,* 79 F.3d 1477, 1482, 1483 (6th Cir.1996); *Garcia v. United States,* 469 U.S. 70, 73, 105 S.Ct. 479, 481, 83 L.Ed.2d 472 (1984)). We are "to ascertain the intention of the legislature from words used in enacting statutes rather than surmising what may have been intended but was not expressed." *Id.* (quoting *Stopher, supra.*).  As the statute separates two clauses with the disjunctive "or" and we have ascertained the meaning of each, there is no redundancy in KRS 11A.233(4).

Based upon our reading of the statute, we need only concern ourselves with whether the parties' contract is an "engagement to influence" KCED's incentive package decisions.  The parties agree on the plain meaning of the term "influence."

With this understanding of what the statute prohibits, the Court must consider the engagement letter and determine whether it contravenes the statute. If the contract term "purports to do what the statute specifically prohibits" the court will declare that term void as against the public policy of Kentucky. *See Matthews v. Ward*, 350 S.W.2d 500, 501 (Ky. 1961).[12]

### H.  The Engagement Letter

#### 1.  Engagement to Influence

To the extent Synergy contends that its activities consisted of merely advising Wieland and rendering opinions regarding incentive package options as contemplated by subsection (7) of the "executive agency lobbying activity" exemption, the argument misses the mark. As we have already indicated, Synergy cannot redirect the analysis away from the statute's prohibition of the engagement of persons and focus on lobbying activity.

Synergy seeks payment under the contract which provides for a contingent fee to Synergy "when the incentive package is finalized and the incentive agreement (Agreement) is signed by Client and the applicable government agency." DN 1-1, p. 3, PageID #9.  The contract provides: **You authorize me to assist you in obtaining state & local incentives as follows…"** *Id.* at 2, PageID #8, and engages Synergy to:

> i)  **Phase** I -  **Project Planning and Control**
>    (1)  establish control of the site selection process presentation
>    (2)  identify alternative locations that will provide economic advantages
>    (3)  gather all relevant data to be presented to all jurisdictions
>    (4)  develop defined work plan to maximize presentation

---

[12] Synergy finds *Matthews v. Ward* inapposite, urging that nothing beyond the contract terms was before that court. This Court has already concluded, however, that Synergy's performance under the agreement is not pertinent in this case as it is the "engagement" -- the parties' contract -- which is in issue. Thus we stand in no different position than the court in *Matthews*, as the sole determination to be made is whether the contingent fee provision of the contract contravenes KRS 11A.233(4).

     (5)  define process and data needs to identify and proactively address any
           unforeseen obstacles
     (6)  maintain presentation of project status as uncertain and tentative
     (7)  maintain client anonymity

  ii)  **Phase II - Implementation**
     (1)  meet with state and local incentive personnel
         (a)  discuss scope of proposed project(s)
         (b)  identify cost benefits of alternative locations
         (c)  address applicability of all potential incentives
     (2)  evaluate alternative implementation options
     (3)  incorporate business objectives into the final expansion proposal
     (4)  negotiate incentive package with all relevant state & local incentive administrators

  iii)  **Phase III - Compliance**
     (1)  assist client in understanding the detailed requirements to obtaining and maximizing
           the authorized incentives through the first year of compliance.
     (2)  assist client with all reporting requirements identified in the incentive agreement(s)
           through the first year of compliance.
     (3)  assist client in monitoring client activities to ensure compliance with the
           incentive agreement(s) through the first year of compliance.

The question, then, is whether these terms engage Synergy to influence the decisions of

KCED with respect to incentive packages sought by Wieland. We find that they do.

Synergy was hired to assist in obtaining state and local incentives and was to be paid a

contingent fee for doing so when the incentive package(s) was finalized. Synergy was to

represent Wieland, maintaining Wieland's anonymity in the process. In the Project Planning and

Control Phase, Synergy laid the groundwork for the projects, gathering data and identifying

locations and incentive options. But it was also tasked with developing a work plan to maximize

presentation, define process and data needs and proactively address unforeseen obstacles. In the

implementation phase, Synergy was required to be actively engaged with state and local

incentive personnel discussing the scope of proposed projects, identifying cost benefits of

alternative locations and addressing the applicability of all potential incentives. After evaluating

alternative implementation options and incorporating business objectives into the final expansion

proposals, Synergy was to "**negotiate incentive package(s) with all relevant state & local**

**incentive administrators.**" This is clearly an agreement to influence KCED's decisions. By its

own terms, the negotiation of the incentive package(s) on Wieland's behalf follows the evaluation of data and the assembly of the final expansion proposals.  Negotiation is the next step in the process to obtain state and local incentives for Wieland.

Synergy characterizes its participation in the process as "only as a tax consultant" and as "a mere conduit of data," (DN 32, p. 9, PageID #451), but it was engaged to connect with all relevant incentive administrators to promote or advocate for Wieland's proposals.  Thus the fact that, under the contract, Synergy becomes entitled to a contingent fee once package(s) are finalized renders the compensation arrangement void as it purports to do that which KRS 11A.233(4) forbids – the contract engages a person to influence KCED incentive package decisions for compensation which is dependent upon the outcome of those decisions.  We reiterate that Synergy was engaged to assist Wieland in obtaining these incentive packages and committed to evaluate them, assemble proposals for them, and negotiate for them to ultimately receive contingent compensation when they were obtained and finalized.

The term "influence" includes having an effect on the condition or development of something.  "Negotiation" includes the arrangement of or bringing about a result. Synonyms for "influence" include "affect," "guide," "form," and "shape."  Synonyms for "Negotiate" include "arrange," "debate," "confer," "mediate," "bargain" and "haggle."  *See Merriam-Webster.com/Thesaurus.*  The terms need not read directly upon one another for the Court to conclude that the contingent fee provision of the Synergy/Wieland contract is clearly contrary to KRS 11A.233(4) and must be found void.

39

*2. Under Illinois Law*

*(a)* <u>*Kane*</u>

Again we note that we are not the only court to reach such a conclusion.  While slightly different in its terms, Illinois' statute considered in the *Kane* case prohibited the employment of another to lobby with respect to any legislative, executive, or administrative action for compensation contingent upon the outcome of the action and prohibited the acceptance of such employment or the rendering of any such service by any person.  25 ILCS 170/8 (West 2014).  Kane entered into a contract to provide Option Care Enterprises, Inc. with assistance to "identify potential incentive opportunities, quantify the anticipated benefits, and negotiate and perfect the state incentives."  *Kane*, 194 N.E.3d at 914.  The contract contained remarkably similar terms to those between Synergy and Wieland including a "negotiation" phase in which Kane agreed he would

> Design, develop, and execute an overall negotiation strategy for obtaining the incentives identified in Phase I.
>
> Gather additional project information and review development plans and other activities that may generate incentives.
>
> Arrange and attend meetings with the government officials to commence the negotiation process.
>
> Negotiate the incentive package with government officials.
>
> Secure incentive proposals from state officials.

*Id.*  The parties agreed on a contingent payment term providing:

> Our professional fees will be based upon 15 percent of the benefits reasonably anticipated to be achieved at the time of the incentive award, plus out of pocket expenses.

*Id.*

40

Kane argued that he functioned as an advisor to Option Care rather than as a lobbyist and that his fee was not contingent upon the outcome of any legislative, executive or administrative action. *Id.* at 919. Rejecting this argument, the court found that "Kane contracted to do more than just advise Option Care about which tax credits it might obtain for itself. Ultimately, Kane had to favorably influence Illinois 'officials' and 'government agencies' in order to earn any compensation whatsoever." *Id.* at 920. The court reasoned

> In our opinion, the meaning of the parties' contract is clear, and Kane's description of it is incorrect and unpersuasive. Kane is downplaying the nature of the services he agreed to provide. It is disingenuous of him to suggest that he contracted to function as an advisor on the sidelines while Option Care sought tax credits, deductions, and other incentives. Kane agreed to engage in certain activities in order to obtain the desired financial outcome for Option Care and earn any compensation for his efforts. He was required to "attend meetings with," "negotiate" with, and "secure incentive proposals from" government and/or state "officials." Then he was required to "[s]ecure the incentives that have been negotiated with the government agencies" and "perfect" a state incentive award. These are obligations to communicate with "officials" in order to influence them to his client's advantage. This is lobbying within the meaning of the statute.

*Id.* Although not expressly requiring lobbying, the court found that the agreement to contingent compensation for the services to be provided on behalf of Option Care contravened the statute:

> The fact that the contract indicated Kane would be communicating with "officials" on Option Care's behalf and would be compensated on a contingent basis for the government incentives he secured from those "officials" is what brought the agreement within the purview of the statute. It was the possibility or tendency of violating the statute that brought the contract within the statute. *Rome* instructs that the law looks to " 'the tendency of the contract' " rather than to what was " 'designed to be done by the plaintiff' " or what was actually done by the plaintiff. (Emphasis omitted.) *Rome*, 271 Ill. App. 3d at 521, 208 Ill.Dec. 163, 648 N.E.2d 1085 (quoting *Crichfield*, 174 Ill. at 482, 51 N.E. 552)… Kane was incentivized to reach as high as he could reach in Illinois government to secure the largest financial benefit for Option Care, earn a percentage of that deal, and be paid anything at all. This was clearly the tendency of the agreement.

*Id.* at 921.

41

### (b) Similarities and Differences

Synergy attempts to distinguish *Kane* from the case at bar in a number of respects.

First, it contends that the contract between Kane and Option Care required something more of Kane than is found in the Synergy/Wieland contract. Kane was required to "secure" the incentives that had been negotiated with the government agencies and "perfect" a state incentive award. *Kane*, 194 N.E.3d at 920. No such terminology appears in the listing of Synergy's obligations. We note, however, that the critical focus of the *Kane* court applies equally to the contract before us:

> The fact that the contract indicated Kane would be communicating with "officials" on Option Care's behalf and would be compensated on a contingent basis for the government incentives he secured from those "officials" is what brought the agreement within the purview of the statute. It was the possibility or tendency of violating the statute that brought the contract within the statute *Rome* instructs that the law looks to the "'tendency of the contract' rather than what was 'designed to be done by the plaintiff' or what was 'actually done by the plaintiff.'"

*Id.* at 921 (quoting *Rome*, 648 N.E.2d at 1088). Synergy contracted to "negotiate incentive package with all relevant state & local incentive administrators" and would be entitled to "10% of the value of approved incentives" due "when the incentive package is finalized." Synergy would thus be communicating with officials on Wieland's behalf and would be compensated on a contingent basis for government incentives which were approved and finalized for Wieland. Similar to Kane, Synergy was "incentivized" by the contingent nature of the agreement, regardless of what was or was not designed to be or what actually was done in the performance of the agreement. *Id.* at 922. Synergy does not explain how the Kane/Option Care contract differs in principal function from its own contract with Wieland. We do not find the distinguishing difference between the two that Synergy suggests.

42

Synergy notes Kane admitted to lobbying on Option Care's behalf and then attempted to extricate itself from the statement.  The court did not permit Kane to file a contradictory affidavit with its motion for reconsideration, finding that the first affidavit constituted a judicial admission and was binding.  *Id.* at 922.  Synergy seeks to distance itself from Kane by contrasting its affidavit with the admission in *Kane*:

> In substantial contrast with *Kane*, Synergy engaged in no such lobbying activity on behalf of Wieland. Synergy never made phone calls to state officials in an effort to persuade them to offer a type of award prohibited by a current moratorium. Synergy never negotiated terms of any potential incentives to drive up their value beyond what the objective headcount and investment projections would dictate. Synergy never once sought any benefit for Wieland that would not have been made available to any company planning to make a similar investment in Kentucky…

DN 22, p. 19, PageID #237.

This is an ineffectual argument because we have already determined that what Synergy actually did is irrelevant to the analysis under the "tendency" test, the very test also employed by the court in *Kane* to find the contingent fee provision void as against the public policy of Illinois. The court did acknowledge Kane's admission secondarily but stated, "Whether we focus on what the written contract forecast or focus on what Kane invoiced for, alleged in his first amended complaint and swore had occurred in his performance of the contract, the record indicates that his contingency fee agreement for lobbying was not enforceable due to the statute." *Kane*, 194 N.E.3d at 922.  We conclude that Synergy's argument concerning its performance under the contract does not distinguish the case at bar from *Kane.*

Finally, Synergy attempts to distinguish *Kane* on the ground that the Illinois statute differs from KRS 11A.233(4).  It is true that the statutes differ in a number of respects.  Illinois' contingent fee statute provided:

> No person shall retain or employ another to lobby with respect to any legislative, executive, or administrative action for compensation contingent in whole or in part upon the outcome of the action and no person shall accept any such employment or render any such service for compensation contingent upon the outcome of the legislative, executive, or administrative action."

25 ILCS 170/8 (West 2014).

> "Lobbying" was defined as:

> [A]ny communication with an official of the executive or legislative branch of State government as defined in subsection (c) for the ultimate purpose of influencing any executive, legislative, or administrative action.

25 ILCS 170/2(e) (West 2014).

> "Influencing" was defined as:

> [A]ny communication, action, reportable expenditure as prescribed in Section 6 or other means used to promote, support, affect, modify, oppose or delay any executive, legislative or administrative action or to promote goodwill with officials as defined in subsection (c).

25 ILCS 170/2(f) (West 2014).

Synergy emphasizes that the Illinois statutes define the term "influencing" while the Kentucky statutes do not. This distinction is noteworthy only insofar as the court in *Kane* applied the statutory definition of "influence" while we applied the common, ordinary meaning of the term. The distinction does not render our analysis of the Kentucky statute infirm, however.

Although we include this analysis of *Kane*, we do not follow the case as authority in reaching our determination that the Kentucky statute precludes Synergy from accepting a contingent fee under the Synergy/Wieland contract. We focus our analysis on the Kentucky statute and history concerning the Kentucky ethics rules. We add some observations from *Kane* merely to illustrate the similarities between the Illinois court's analysis and our own as there is no controlling authority to guide us. We noted previously that *Montana Automobile Ass'n v.*

*Greely* reached a contrary conclusion, but without helpful analysis.[13]   Additionally, we conclude that the United States Supreme Court precedent of *Hazelton, et al.* constrains our analysis of the contingent fee prohibition.[14]

### 3.  The Incentive Packages

Synergy argues that the industrial revenue bond (IRB) incentives for Wieland's Shelby County manufacturing facility were approved by the Shelby County Fiscal Court and therefore fall outside the contingent fee prohibition of KRS 11A.233(4).  This is yet another performance-based argument by Synergy.

To the extent Synergy suggests that this Court should parse its actions in performing under the contract such as considering contacts it may have had in regard to negotiating the IRB incentives and determine whether each aspect of its work violates the contingent fee prohibition, we reject the argument.  Again, Synergy argues for a performance-based rather than a contract-based analysis.

In any event, a review of the incentive package documents submitted by Synergy reveals that the IRB incentives are part of a larger incentive package approved by KCED and its agency, KEDFA.  Synergy only becomes entitled to a contingent fee under the parties' contract when the incentive package is finalized and incentive agreement is signed.  DN 1-1, p. 3, PageID #9. That provision does not permit a parsing of the incentive packages for the projects into individual incentive components such as the IRB incentives for the Shelby County manufacturing facility.

---

[13] See p. 33, *infra.*
[14] See p. 33, *infra.* citing *Florida League of Professional Lobbyist, Inc. v. Meggs*, 87 F.3d at 462.

*4.   Alternative Payment Terms*

The parties agree that if Synergy is precluded from receiving a contingent fee it is entitled to hourly compensation for the work it performed.  DN 1-1, p. 3, PageID #9.  Synergy agreed that it would keep reasonable records of the time spent on the engagement to substantiate the hourly compensation structure in the event Synergy was unable to accept the contingent fee.

Under Kentucky law, where a term of a contract is declared void, "the contract will not be set aside unless good and bad parts cannot be separated without altering its purpose."  *Cox v. Wagner*, 907 S.W.2d. 770, 771 (Ky. 1995).  Illinois courts adhere to the same principle.  *Kepple and Co., Inc. v. Cardiac, Thoracic and Endovascular Therapies, S.C.*, 396 Ill. App. 3d 1061, 1066, 920 N.E.2d 1189, 1193 (2009) ("The current status of the law on severability of a contract, as set forth in section 184 of the Restatement (Second) of Contracts, is that when some portion of a contract is unenforceable as against public policy, 'a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange.'").

There is agreement that there is no alteration of purpose in simultaneously voiding the contingent fee provision and enforcing the alternative hourly payment structure.  Indeed, this appears to be the very purpose for the inclusion of the two provisions – to ensure payment to Synergy for work performed on behalf of Wieland.

It is undisputed that Synergy has not provided Wieland time records for its work.  Its failure to do so was clearly based upon its contention that it was entitled to payment of a contingent fee.  As the Court will declare the contingent fee provision void as against the public policy of Kentucky, it will also declare that Synergy is entitled to payment for its work calculated under

the alternative hourly compensation structure and substantiated by the records required to be maintained by Synergy.

V.      *Equitable Counterclaims*

Synergy has asserted equitable claims for quantum meruit, unjust enrichment and promissory estoppel as counterclaims in the alternative to its breach of contract counterclaim for the unpaid demand for a contingent fee.  Wieland seeks summary judgment on these counterclaims as the payment due Synergy will be determined by the alternative compensation provision of the parties' contract.  This contractual resolution of the payment issue vitiates the equitable claims insofar as they are available only in the absence of an enforceable contract.  *See Vanhook Enters., Inc. v. Kay & kay Contracting, LLC,* 543 S.W.3d 569, 574 (Ky. 2018)(quantum meruit denied where written contract governs); *Furlong Dev. Co. v. Georgetown-Scott Cty. Plan. & Zoning Comm'n*, 504 S.W.3d 34, 40 (Ky. 2016)(unjust enrichment unavailable when express contact controls); *Archon Constr. Co., Inc. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, 413 Ill.Dec. 791, 78 N.E.3d 1067 (2017) (unjust enrichment and quantum meruit precluded by express contract).

Additionally, the counterclaim for promissory estoppel merely asserts alternatively to its breach of contract claim that:

32. Wieland unambiguously promised Synergy that it would pay Synergy for its services.

33. Synergy reasonably relied on Wieland's promise to pay.

34. Synergy's reliance on Wieland's promise to pay was expected and foreseeable by Wieland.

35. Synergy relied on Wieland's promise to pay to its detriment.

Counterclaim, DN 13, p. 4, PageID #51.

As Wieland admits its obligation to pay Synergy for its services under the parties' contract and the claim for promissory estoppel is made in the alternative, the claim is rendered moot by the Court's declaratory judgment.


*VI.     Conclusion*

For the reasons set forth herein, Synergy's motion to dismiss (DN 12) and motion for summary judgment (DN 22/23) will be denied, and Wieland's motion for summary judgment (DN 16) will be granted by separate Order.  The Court will also enter a Declaratory Judgment setting forth the rights of the parties under the Synergy/Wieland engagement letter.


**IT IS SO ORDERED.**

March 29, 2023

Charles R. Simpson III, Senior Judge
United States District Court

48